LKLEES, Chief Judge.
On October 11, 1996 the appellant was charged by bill of information with theft of over five hundred dollars and issuing a worthless check for an amount over five hundred dollars. The appellant elected to have a judge trial which was heard on March 30, 1997, April 25, 1997, and May 23, 1997. At the conclusion of the trial, the court found the appellant guilty as charged on both counts. A motion for judgment of acquittal was heard on August 13, 1997. The court then ordered the appellant to pay the victim restitution in the amount of $50,000 plus interest. The appellant was remanded to jail pending payment. On August 14, 1997, the appellant paid the victim $57,000 and was released from custody. A pre-sentence investigation was ordered and the sentencing was reset. On April 9, 1998, a motion for new trial was heard and denied. The court then sentenced the appellant to five years at hard labor, suspended, three years active probation with special conditions, on each count, to run concurrently, and ordered to pay $6,000 in fines.

STATEMENT OF THE FACTS

On July 28, 1995, defendant Richard Keyworth entered into a notarized contract with his friend and neighbor, Mr. Elmo Glynn, witnessed by Mr. Glynn’s wife, Norma Glynn, entitled “Notice of Assignment of Contract.” Mr. Glynn gave the defendant a check for $50,000.00, and received, according to the contract, an assignment of the Municipal Yacht Harbor lease of boatslip # 131 and boathouse at 121 North Roadway, held in escrow by an escrow agent. The contract confected between Mr. Glynn and the defendant permitted the assignor (the defendant) to cancel the assignment at anytime within the following sixty days, upon payment to the assignee of $50,000.00 plus $27.00 per day *314 interest, from the date of the contract until paid.
|aAs explained by the defendant at trial, these lease agreements are often held in escrow by an escrow agent to avoid transfer fees and increases in the lease amount assessed by the City when a transfer is complete. As explained in further detail by the attorney-notary who handled the transaction when the defendant purchased his rights to the lease from the previous owner, an agreement to sell or purchase is recorded in the public record to protect the buyer against third parties. The escrow agent holds the actual transfer document which is binding between the parties.
Mr. Glynn handled the negotiations with the defendant. Mr. Glynn apparently believed, and led his wife to believe, that his payment to the defendant was a loan which would be repaid at the end of sixty days; and the boathouse was security for the loan. Defendant maintains that, although he intended to repay the money and reclaim his property, the contract effected a valid assignment of a property right from the time it was confected, subject only to his right of cancellation.
When the sixty-day deadline neared, Mr. Glynn asked to have his money returned with the agreed upon interest. The defendant told him that he did not have the money. Mr. Glynn insisted that he needed to replace the money in his pension fund or suffer penalties. The defendant wrote him a check for $51,620.00. The defendant stipulated that he knew there were not sufficient fends in the account to cover the check. He contended that he advised Mr. Glynn to hold the check, and he would advise him in two days whether or not he could cover it.
According to Mrs. Glynn, the defendant told'her and her husband, at the execution of the initial agreement, that if he could not make the payment, they would have a boatslip worth over $70,000.00. The defendant likewise contended [athat he advised Mr. Glynn when he presented the check that, if he could not cover it, Mr. Glynn would have a boatslip worth $75,-000.00.
Mr. Glynn deposited the check on September 28, 1995. On October 13, after receiving notice from the bank that the check was uncollectible due to insufficient funds, Mr. Glynn went to see the defendant about getting his money back. He returned home and advised his wife that he had been “conned.” A few minutes later, Mr. Glynn died.
Mrs. Glynn served as executrix for her husband’s estate. However, her son, Dr. Gary Glynn, handled most of the administrative duties for her. He spoke with the defendant on several occasions requesting repayment of the funds to no avail. When the defendant did not repay the funds, Dr. Glynn inquired from the Harbor Master about taking possession of the property. The Harbor Master advised him that the lease was not properly transferred, but it did not matter because a consent judgment for $875,000.00 in favor the Whitney Bank and against the defendant encumbered all of the defendant’s property and predated the Glynns assignment. Nevertheless, the Glynns recorded their assignment. They then reported the matter to the district attorney’s office.
After investigation, the State charged the defendant with theft by fraud against Mr. and .Mrs. Glynn, and issuing a worthless check to Mr. Glynn, both at a value of $500.00 or more. Dr. Glynn testified that he received a fax letter from the defendant which advised that the criminal claim against him was unfair, that it damaged his business, and if the matter was not expunged he would seek damages.
14Between the arrest and trial, there was a sheriffs sale of the subject property, which defendant claimed was premature and in litigation. Throughout the trial the defense produced offers to repurchase the property from the estate, which offers were rejected by default. Mrs. Glynn and Dr. Glynn both testified that they were *315 advised that the offers were of no value and should be ignored.
Mrs. Glynn testified that she and her husband were aware of the approximate value of the boathouse because they owned their own boathouse and another one.
The defendant testified that he paid $75,000.00 for the boatslip when he purchased it from Mr. and Mrs. Elwood Hebert in July of 1993, which amount was not contested by the State. The defendant further testified that he did not think the Whitney judgment encumbered the assignment of the boatslip because no transfer of property was recorded, only an assignment of a contract relative to a lease agreement. The defendant further noted that, due to the death of Mr. Glynn, his repurchase of the property required a court order through the estate. The matter was further complicated by the illness of the attorney for the estate, who was unable to review offers from the defendant to repurchase the property. Instead, Mrs. Glynn and her son relied on the district attorney’s office, which told them to ignore the offers by the defendant to repurchase the property.
At the motion for new trial, the court recognized attorney Richard Regan as an expert in the field of bonds for deed and escrow agreements. He was permitted to testify as to new facts, as well give his opinion of the facts of the case. Regan testified that he was the notary for the transfer of the property from the Heberts to the defendant, but not the assignment from the defendant to Mr. Glynn. He further testified that when a regular act of cash or credit sale was not.appropriate or desired by the parties, an escrow agreement served the purpose. He testified that | Bhe had explained the concept and the mechanics of the law to a federal bankruptcy judge in a case which involved an escrow agreement. He further testified that the contract confected between the defendant and Mr. Glynn was a completed assignment with right of redemption, not a loan. He further testified that the assignment document represented a recordable interest from the date it was executed.
As to the agreements to repurchase proposed by the defendant, Mr. Regan testified that they were in standard form and permitted the customary time for the Glynns to respond to the offer. Mr. Re-gan noted that the notary for the lender or the buyer bears the responsibility to research a piece of property for hens. He further noted that most creditors act immediately to seize property on a judgment, and many attorneys are unaware that an assignment or an escrow agreement is subject to attachment. He thus opined that the Whitney did not seize and sell the property until well over a year from the consent judgment because the attorneys at the bank were not certain that they could.
Subsequent to trial, the trial court told the defendant that it was “in his utmost interest” to have turned over to Mrs. Glynn a check for $51,620.00 by cashier’s check on or before July 25 (the date set for sentencing). Sentencing was continued until August 13, 1997. On that date, the trial court asked if the defendant had turned over the money. Defense counsel explained that the defendant had a loan commitment to purchase the property. The trial court found that response insufficient and ordered the defendant remanded. On the next day, counsel for the defendant presented a check obtained from the defendant’s mother. The court then ordered a pre-sentence investigation and released the defendant on his bond pending sentencing.
[^¡Following sentencing, the court noted that it would consider placing the offense under La.C.Cr.P. art. 893, so that the matter would have the same effect as an acquittal upon successful completion of probation. However, the court declined to do so on the date of sentencing, but stated that it might do so at a later time, if the defendant had no further contact, either personal or business, with the Glynns. As indicated in exhibit C of the Motion for *316 New Trial the defendant executed an act of exchange on May 2, 1997, which was duly recorded on May 9, 1997, by which he obtained a partial release from the Whitney judgment clearing the title on the subject boatslip. Accordingly, as noted by the defense, Mrs. Glynn now has the cash and the estate has the unencumbered property. Considering the judge’s order that the defendant not have any contact, personal or business, with the Glynns, and further considering the trial court’s refusal to place the convictions under Article 893 until some later date, the defendant is precluded from contacting the Glynns or the attorney for the estate relative to restoring his property interest.

ERRORS PATENT REVIEW

A review of the record for errors patent reveals that there were none.
| ASSIGNMENT ONE
The appellant argues that the evidence adduced at trial was insufficient to support a finding of guilty as to count one because there was no evidence of any intent to permanently deprive anyone of property by an unlawful means. The standard of appellate review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Theft is the misappropriation or taking of anything of value, without consent, or by means of fraudulent conduct, with the intent to permanently deprive the other person of the object taken. La. R.S. 14:67. In the absence of qualifying provisions, the term “intent” refers to “general criminal intent.” La. R.S. 14:11. General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender must have known that the prescribed criminal consequences were reasonably certain to result from his actions or inactions. La. R.S. 14:10(2).
The defendant testified that the transaction between himself and Mr. Glynn was a transfer of an interest in real property for consideration. The expert called by the appellant at the motion for new trial reviewed the assignment document and confirmed that it was an assignment of interest with a right of redemption, not a loan.
The State argues that, because the property was encumbered by a consent judgment, and the appellant was aware of the consent judgment, he was aware that the interest he transferred to Mr. Glynn was of no value. The defendant avers that he did not know that the consent judgment encumbered this assignment of | sinterest.[1] The expert on escrow agreements testified that many creditors do not attach these assignments because they are not certain that the law-permits it. The expert further testified that judgment creditors usually seize property from a debtor as soon as they become aware of the property’s existence. He surmised that the Whitney’s delay of one year before seizing the subject property interest was likely because its lawyers were unaware that they could do so.
As noted by the appellant, the record fails to indicate whether the Whitney judgment was recorded prior to the assignment he granted to Mr. Glynn in exchange for the $50,000.00. If the judgment was not recorded prior to the assignment to the Glynns, then had Mr. Glynn immediately recorded his assignment, it would not have been incumbered by the Whitney judgment. Conversely, had the Whitney judgment been recorded prior to the assignment, Mr. Glynn had judicial notice of the encumbrance, as all *317 persons have “constructive notice” of the existence and contents of recorded instruments affecting immovable property. Hasslocher v. Recknagel, 160 So.2d 421 (La.App. 2d Cir.1964), writ denied, 245 La. 964, 162 So.2d 14 (1964); Brown v. Johnson, 11 So.2d 713 (La.App. 2d Cir.1942).
19With regard to evidence of defendant’s criminal intent to defraud, the record indicates that when Mr. Glynn requested the return of his money, defendant replied that he did not have the funds, but defendant issued Mr. Glynn a check and asked him to hold it temporarily. Defendant further stated that a default in their agreement would transfer ownership of the boathouse worth over $70,000.00 to the Glynns. In fact, defendant did not own the boathouse, and he was aware of this fact. Further, although the appellant testified that he was unaware that the Whitney judgment encumbered the property right he assigned to Mr. Glynn, he stated he was aware of the existence of the judgment against him. The record indicates that the judgment was a sizable amount, $875,000.00, and there is no testimony that defendant’s worth was greater than this amount such to support defendant’s theory that the judgment did not affect his property right in the boathouse. Finally, although there is no specific testimony that defendant promised that the property was free of encumbrances, the testimony of Mrs. Glynn certainly establishes that she and her husband were led to believe that the boathouse was of sufficient value to act as collateral for the $50,000.00 loan. Under the circumstances presented here, we conclude that the evidence presented was sufficient to indicate that the appellant had the requisite intent to defraud the Glynns. We find no error in the ruling of the trial court.

ASSIGNMENT TWO

The appellant argues that the evidence was insufficient to support a conviction for issuing a worthless check since there is no evidence that the giving of the check was in exchange for something of value with the intent to defraud. Issuing a worthless check is the issuing of a check in exchange for anything of |invalue, whether the exchange is contemporaneous or not, with the intent to defraud, when the offender knows at the time of the issuing that he has not sufficient credit for the payment in full of the check upon presentation. La. R.S. 14:71. The statute further provides that the failure to pay a check within ten days of notice by certified mail of its nonpayment shall be presumptive evidence of intent to defraud.
The appellant maintains that, after the expiration of the time period granted to the defendant to redeem his interest in the boathouse, Mr. Glynn approached him and urged him to exercise his right of redemption. The defendant then tendered a check to Mr. Glynn which was later returned by the bank due to insufficient funds.
The State contends that the consideration for the check was the $50,000.00 “lent” by Mr. Glynn to the defendant, who used as collateral a property right that he knew had no value. The defendant contends that with $50,000.00 Mr. Glynn purchased an assignment of a property right which the defendant believed had a value of about $75,000.00. The defendant further contends that when Mr. Glynn asked him for the return of his money plus interest, it was incumbent upon Mr. Glynn to transfer that property interest back to him. The defendant thus concludes that, because Mr. Glynn never reassigned the property interest, there was no consideration for the check. He further avers that he only gave Mr. Glynn the check “in trust,” advising him to hold it, and not deposit it unless the defendant called to tell him he could cover it.
The appellant’s argument, in this case, is flawed. He admits that he issued the check knowing that he could not cover it. By this time, the defendant had to be aware that Mr. Glynn considered their pri- or transaction a loan and wanted to be *318 repaid. The State presented evidence that the defendant was given notice, by Incertified mail, demanding payment in fall. Defendant took the stand to explain that he gave the check to Mr. Glynn, but told him to hold it. However, while the defendant made several offers to repurchase the property during the trial, there is no evidence that he did so after notice that the check had been returned. Rather, he simply could not or would not make the check good. Moreover, Dr. Glynn testified that the defendant told him that he was trying to get the money for them. Accordingly, the defendant failed to rebut the presumption that he issued the check with the intent to defraud.

CONCLUSION

Accordingly, for the reasons assigned herein, the conviction and sentence of defendant Richard F. Keyworth on both counts are affirmed.

AFFIRMED.

. The State objected to the defense calling a fact witness on a motion for new trial, which objection was denied by the court. Because the defense elected a judge trial, this witness, who testified relative to both fact and opinion, was tantamount to an extension of the trial by an additional defense witness.